The case this morning is Martin v. Financial Asset Management Systems, et al., number 17-14488. Mr. Hornsby. May it please the Court. My name is Brandon Hornsby and I represent the appellant in this case, Ms. Martin. This case presents two main issues for the Court to decide upon. The first issue is whether the trial court erred by dismissing Ms. Martin's retaliation claims based upon a credibility determination. The second issue that this Court has to make, has to answer here today, is whether the trial court erred by dismissing Ms. Martin's FMLA claims based on the fact that she did not see a health care provider as defined by the FMLA. Before I turn to those two issues, I want to briefly just talk about some of the core facts that I think both parties are going to agree about. Ms. Martin worked for both defendants. We have the corporate defendant here and the CEO, Mr. Hogan, who is the decision maker. In 2012, Ms. Martin made two separate charges of discrimination to the EEOC that are not part of this case but are part of the evidence of this case. They were against Mr. Hogan and they, just like this case, they involve gender and race discrimination. In December of 2012— Is the resolution of those claims in the record? Yes. Yes, there's testimony about that those cases were settled in December of 2012. Then, in 2014, Ms. Martin made another complaint of gender and race discrimination against Mr. Hogan. This time, it was internal to the vice president of the corporation. During that time that she was speaking to the vice president of HR, she said that she had great anxiety by the way he was treating her as part of this discrimination and that she would need to take medical leave to treat herself. The specific issue she was concerned about is that she had heart problems and she was worried that her heart problems, the anxiety would induce a heart attack or a stroke and that's what she testified to and I'll get to that later. Two days after she made that complaint, she was terminated by Mr. Hogan. I think both parties agree about all those facts except opposing counsel is going to tell you that Mr. Hogan's testimony is and the HR vice president's testimony is there was no mention of any discrimination whether it be by race or gender. She testified that she did make those claims. She absolutely did unequivocally. I think we have to credit that testimony of what she says she told the person she complained to. Absolutely, Your Honor. But Clover requires a little bit more than that, right? There has to be some showing and the debate here is about how much of a showing. That's exactly right. How much of a showing there has to be that the decision maker knew about, was on notice of that sort of complaint, right? Exactly. And we think the fundamental flaw in the trial court's analysis here was that the trial court didn't look at the totality of circumstances, how they intertwine with each other, and instead looked at each inference that the plaintiff presented in isolation. What's your best evidence that Hogan knew about this? Just the situation that went on? Well, I think the best evidence is, number one, he knew there was a complaint before against him. You mean the first one or the second? He knew she had made a complaint before. Okay. And, number two, there was a policy manual that specifically said after a complaint is made in this corporation, the alleged perpetrator will be notified before there's an investigation. So we think if you add those facts together, there's an inference that he should have known. We know that by Hogan's own admission that he met with the vice president of HR. That Bain? Yes, yes. Now, Hogan denies that he had any knowledge. There's no question about that. And I think what's important, and I was thinking about that this morning, since the Clover decision, I think, and I may be dating myself to say, you see more and more employment cases, what I call the Sergeant Schultz defense. I see nothing. I know nothing. There's nothing I know about. When these CEOs, when these decision makers are deposed in these cases, they are a blank slate. They know nothing. So it's very, very hard for an employment plaintiff to ever have a smoking gun or direct evidence. It may happen in one in a thousand cases. It's all going to be through inferences. And what the court did is the trial court went through the things like that manual. She went through the meeting that Hogan admitted that he had with Bain and said why each piece of that could not be satisfactory for the jury. But what the court didn't do is look at the totality and how all of those pieces together could make a reasonable jury look at it and say, hey, if I add one plus one plus one plus one together, then maybe I do have discrimination. What kind of—do you have to show that he was told that he— or do you have to leave open the possibility that he was told that these types of claims have been made? Or do you merely have to show that he may have been able to assume? We believe the standard has to be that he may have known. It can't be—I mean, you have to have an inference that he knew. May have known or may have been able to assume or may have been able to guess. No, I don't think assume would probably be enough. I think it's got to be strong. Even we would concede that it has to be stronger than that. But known would be direct evidence. I admit I knew about it. You're almost never going to be able to get that. So you're going to have to prove it through inferences. Well, but—I don't know. I don't want to restate your argument, but I'm not sure you're stating it correctly. The standard is knowledge. You're just saying it can be proved circumstantially through a totality of the circumstances. Absolutely. Do you think that he could—do you think that there could be an issue of fact if— which we don't do on summary judgment, but if one were to fully credit Bain's testimony that she did not tell him, right? Let's assume that there's a state of facts where we all know that she affirmatively did not tell him. Sure. Do you still think there could be an issue of fact about whether he knew? Yes, based upon this collective information, because then what you do is turn to his shifting reasons for his decisions in the case. And examples would be like he said that the reason he initially gave for the termination was failure to meet performance standards. Then he gave another one that said it was deceptive and insubordination. So he gave different reasons there. He also gave shifting dates. Hogan said he testified during the deposition that he made the decision on the 26th, the very day that she complained. Then in an unemployment hearing, he said he did it on the 28th. He also said that he had a shifting explanation. He said he made that decision in the unemployment hearing by consulting with the vice president of HR. Then in his deposition, he said he did not consult with the HR. So when you add all of this impeachment evidence to all of this circumstantial evidence, I think that's why you have to give it to the jury. The second issue, and the harder issue for me, is the FMLA issue. In this particular case, the court found that Ms. Martin was not eligible for FMLA protection because she did not go to a health care provider as defined by the FMLA. Before I talk about that, I just want to tell you what the record shows. This is the complaint that she said. This is her deposition testimony of what she said to the HR director. As I told Lydia Bain, the VP of HR, I wanted to make sure, and she's talking about the day she made her complaint, I didn't end up in the hospital again. I was very lucky in November not having any heart damage, not to have a heart attack or stroke or die, just like the doctor said, and I wanted to make sure that I was taking care of my health, making it a priority. There is no question that the defendants were on notice that she had a potentially serious health condition. So FMLA was triggered at that point. The difficulty is that Ms. Martin, like all regular employees, she went to her health insurance pamphlet that was provided by the defendant. She picked out a licensed clinical social worker to talk about her anxiety, and she went and was treated by that person. Now, after she made that complaint, she was terminated two days later. There was no interaction about the FMLA with the defendants. Over a year later, when the lawsuit is filed, they started going through all the details of the FMLA and saying why she didn't comply with the FMLA. One of the problems she had is that she relied upon the company's health insurance. That would be normal. All normal people would do that. But the FMLA has very tedious definitions about what a health care provider must be. It also has a provision that says if you use your health care plan, and they have the authority to make FMLA decisions, you can use that. Did the company booklet or bylaws or whatever it was, did they list this Bruce woman as a person who was a health care provider? And that's the key question. No, we don't. She testified that she was that person, but my client had no knowledge of that because what happens with the FMLA is when you make that complaint, and it's serious enough as hers was, the burden shifts to, it must shift to the employer. And this is our equitable argument here. There are federal regulations, and we've provided those to the court because I wanted to give an example of how equity would intervene here. But an example is 29 CFR 825.306. This is a certification provision. The defendants, if they didn't think she was seeing some or had a serious injury or a serious health problem, they could have sent it to her. They're required under law to send it within five days. There's nothing in the record that they did that. There's a notice provision. She didn't ask for it either, did she? She didn't ask for it because she didn't know that she needed to. Because she didn't have to. Once she put them on notice, the burden shifted to the employer. The employer should have notified her. There's a second regulation. What do you mean by put them on notice? What did she put them on notice? She said, I am having anxiety. I'm worried about having a heart attack. I have to take time off. So they were on notice that she had a potential FMLA event. Once they knew about it, that triggered the FMLA burden on them where they can send her notice. If they didn't think she was doing things right, they can say, this is why FMLA is denied. And they're supposed to do that within five days. But did she say anything about FMLA? She didn't, but this court has held that you don't have to use FMLA. You don't have to use that trigger word. I see that my time is up. No, you can continue answering. So I think what's very key here is the case law says you don't have to use the magic word FMLA. The defendant just has to have notice. And an excellent case on that is Cruz v. Public Supermarkets, 428 Fed 3rd 1376. And the proposition of that case, that was bad for the employee, but it did say the burden shifting that goes on is that, number one, the employee has to give notice of a serious health condition so they can reasonably conclude. If she had gone in there and said, I have a headache, that's not enough. But she went in there and said, I'm having anxiety. You know I have a heart condition. I'm worried I'm going to have a heart attack or a stroke. I need to take some time off. At that point, the employer needed to give her notice if they were challenging her health condition. Sorry, I want to drill down. What does that case say is required for notice by the employee to the employer? Yeah, the specific language that it uses is that you, and I'm going to quote it, is that you don't have to use the FMLA. You don't have to say that, but you have to put them that there may be an FMLA qualified health event. You have to basically, it has to be serious enough. And it talks about if you have brain, it literally talks about if you have brain cancer, you can't just go in there and say, I have a headache. You've got to give them enough information. But if you give, yes, Your Honor. Well, I guess if you say I have brain cancer, got to run. Is that enough? Is the mere identification of a serious issue? It's enough to shift the burden to them to say we don't think you have brain cancer. Here's a certification. And the Department of Labor issues a five-page form that the employee then has to fill out. Likewise, they can say we're denying it because you're not going to a qualified provider. The employer has the ability to do that. They have to do it within five days of getting that. The record has none of that in here. And what my argument is to the court on that is if this exact situation happens, because employees all around are not going to know that, and the employer doesn't do these things, doesn't give them notice of what they've done wrong, because my client could have cured this. They're saying, well, you didn't go to the right person a year later. Well, of course she can't prove a year later because time has gone by. They've never put her on notice. But if they follow the law, the regulations, and she knows within five days she can go to the correct provider, and then she would have the ability. But isn't the example that Judge Grant gave is certainly a type of medical condition that could put an employer on notice that you've got a serious medical issue. Absolutely. Stress sort of straddles the line, right, because everybody undergoes some level of stress at some point in the job. And so stress could be a momentary, episodic condition. It may be something that's happening on a given day where someone's had a really, really bad day and just needs to take a break for a while. Or it could be something very serious. Right, and that wouldn't be enough. You have to get more. And the testimony in this case is that the company knew she was suffering from severe accelerated hypertension. She had a blood pressure of 207 over 135. That's on page 251 of her deposition. And that her triggers for this heart condition were anxiety and depression. And she testified that when I spoke to Bain, when I spoke to HR, that I told her about these things. That's not what HR says, but that's what she testifies to. But HR does admit that she said, I was having anxiety. I needed to take two days off. But did you say that she went to a social worker counselor sort of person? Yes, because of the anxiety. That's where she wanted to start. But is it really fair to see that as noticed? Because if I were having a heart attack from stress, I think I would head to a cardiologist rather than to a social worker, as very important as the counseling piece can be. If it's a medical issue where you're fearing for your life, wouldn't you head to the ER to a cardiologist? And perhaps that would have put the company on notice? You may, but not everyone does. I mean, there's thousands and thousands of employees, and they're not all as educated. They may not realize that. And she may have just wanted to address her anxiety so it didn't get that bad. She knew she had the condition. She knew anxiety was a trigger. So she looked at the company insurance plan, and she made a decision to go to someone who looked good to her. And if the defense had said, look, you have to go to somewhere else, she could have cured it. But they never said that to her. And so what we are saying is when that happens, you can't dismiss the case on summary judgment. You cannot use that against the employee if the employer hasn't met their burden. Thank you. All right, thank you very much. You saved your time for rebuttal. Mr. Saltzman. May it please the Court. My name is Aaron Saltzman. We represent Appellees Financial Asset Management Systems, Inc., and Jerry Hogan. Before I get started, Your Honors, I'd like to address the point. The argument that the employer never gave notice and thus has somehow precluded from arguing that Mrs. Martin was not FMLA benefits eligible was not thoroughly briefed in either of the two briefs, the opening or reply brief by the appellant, and thus we argue that it's waived. We agree that this appeal is about two issues. First, Mrs. Martin cannot prevail on her retaliation claims unless she presents evidence that the decision maker, Jerry Hogan, actually knew about her protected activity when he decided to terminate her employment. Evidence that he could have known is not sufficient. We believe that's part of the holding in Clover. Well, but both of you are stating it in slightly different ways, but the question is whether a reasonable jury could find that he had knowledge at summary judgment, right? That's correct, but I think it's in— She doesn't have to prove beyond doubt at summary judgment that he knew. You can, of course, do that if you have a direct evidence case, but in a circumstantial evidence case regarding something like mental state knowledge, the issue is did she present enough evidence, circumstantial or direct, to allow a reasonable jury to find that he knew? That's the standard, right, and that's the question. That's correct, Your Honor, but I think it's important to differentiate between two types of evidence. One is evidence, direct or circumstantial, that the decision maker actually knew about protected activity and, on the other hand, is circumstantial evidence that the decision maker could have known or had the opportunity to learn about the protected activity. I think in this case there are two—I'll give two illustrations to explain what I mean by that. The first is a Sixth Circuit case, Allen v. Michigan Department of Corrections. In that case, the plaintiff, Allen, and all of the other African-American corrections officers were moved en masse off of a particular cell block. The plaintiff, Allen, then filed a grievance over the transfer. Shortly after filing his grievance, Mr. Allen and only Mr. Allen was moved back to the original cell block. The Sixth Circuit determined that that was sufficient circumstantial evidence that the decision maker actually knew about the protected activity, the grievance. That's because the subsequent transfer could be understood as taken in response to the grievance. On the other hand, in Clover, Ms. Clover, who was the plaintiff, participated in a sexual harassment investigation against her second-level— So in that case, so in the Sixth Circuit case, the adverse action was the proof of knowledge? That was not the adverse action. That was—I believe the adverse action was a termination. I'd have to check back on that case. So it was the conduct of the decision maker that was used circumstantially to prove knowledge? There was conduct that occurred after the protected activity that showed that at that time, prior to the adverse action, the decision maker knew about the grievance. Circumstantially? Circumstantially, yes, Your Honor. That case seems, from the little you've said, that case seems to align here because there's certainly adverse action after she makes a complaint, which she says was based on racial and gender-based discriminatory motives. And here, you know, Shakespeare got some things right in his plays, and one of the things he said in one of them—I forget which one—is at the past his prologue. And I wonder whether or not there's any relevance to the fact that Ms. Martin had accused Mr. Hogan in the relatively recent past of that type of discriminatory activity. Does that matter at all in the summary judgment calculus? I want to address—I think there's two points, or I think you maybe asked two questions, so I'll address the first. One is in the Allen case, the Sixth Circuit case. There were two—my understanding is there were two actions. One is the adverse action, the termination. So in that case, what we're talking about there is temporal proximity, the phrase used in a lot of cases. I don't want to talk about the Sixth Circuit case right now. I want to talk about this case. So does it matter at all in the summary judgment calculus that Ms. Martin had accused Mr. Hogan of discriminatory activity within the past couple of years? Does that matter at all in figuring out whether a reasonable jury could find that he had knowledge that this time around she also complained about discriminatory activity on his part? We believe the district court properly disregarded that or found that evidence to be insufficient. Those earlier charges occurred, I believe, around 15 months prior to this 2014 complaint to the HRBP. So— You think that's too far out? Absolutely, Your Honor. Absolutely. It assumes that— But if your boss discriminates against you on a protected ground 15 months before, doesn't that provide some sort of background context for complaints that you might make against him or her in the future? Your Honor, I think a little bit of context for the workplace here is important. They had just ended a—particularly by what Ms. Martin alleged was a very, very contentious manager meeting. She then complained to the HRBP about the way she'd been treated in the meeting. So I don't think it's reasonable to assume that the decision-maker should have inferred that because she filed a charge 15 months earlier, that this complaint after a contentious meeting was about race or sex discrimination. I think it's just as—probably more reasonable to assume that she complained that she had been treated poorly during the meeting. That doesn't mean that it was about a protected characteristic. What about Mr. Hornsby's contention that Mr. Hogan also shifted or changed his reasons for the termination decision and also had conflicting testimony at the EEOC proceedings and in his deposition about the timing of certain actions he took? Do those matter? The shifting—well, the shifting—any shifting reasons for the employment decision, I do not believe matters, Your Honor, because we—our argument and what the district court found was that the appellant did not meet her prima facie burden. Thus, we never get to what the reason was for the termination. That was not part of the analysis. So you don't think that gets considered in the mosaic of evidence to go to the prima facie case either? No, Your Honor. I do not. You think you can segment evidence out like that, that this evidence falls into this little box and that evidence falls into this little box and the evidence can't cross over? What was—what the parties briefed in the district court on summary judgment was whether the plaintiff had met her burden, her prima facie burden. That's what the parties briefed in the lower court, and that's what the lower court decided. So I think what's properly before this court is whether the plaintiff—the appellant met her prima facie burden, which doesn't—does not require the employer to offer any kind of reason for the termination. What evidence do you think—what evidence do you think can legally satisfy a prima facie burden under Clover? Under Clover, I believe there has to be— if you're making an admission that's on record, then, of course, that'll get you past summary judgment on the prima facie case. But in a circumstantial evidence case, what evidence do you need to show that the decision-maker knew that a complaint about discrimination had been made against him or her? Your Honor, I believe there's two types of circumstantial evidence that need to be explained. The first is evidence that the decision-maker actually knew, which, like in the Allen case in the Sixth Circuit, was the subsequent transfer after the plaintiff filed a grievance. He filed a grievance. He and only he was then transferred back to his original cell block. That's circumstantial evidence that when he was transferred back, that person did so in response to the grievance. On the other hand, in Clover, there was only evidence that the decision-maker could have known or had the opportunity to learn about the protected activity, and that, Your Honor, is insufficient. What would be sufficient, though, besides direct evidence, either testimony from the decision-maker that he did know or testimony from someone else that they did tell him? In your view, is there any category of circumstantial evidence that would be sufficient to show that he knew? Absolutely, Your Honor. So going back to the Allen case, there was an action taken by the decision-maker, the subsequent transfer back to the original cell block, which was circumstantial evidence that when that transfer was made, they knew about the grievance. I'm with Judge Jordan. I don't want to put words in your mouth, but that sounds pretty similar here. It sounds like you could say that her termination was evidence that he knew that she had engaged in that protected activity. I'm sorry, Your Honor, I didn't mean to interrupt. The difference in Allen is that there were two actions. One is the adverse action, but the one prior is the transfer back to the original cell block. In Clover, she was also terminated. The plaintiff was also terminated. So if it was sufficient just that the adverse action be the subsequent activity that shows knowledge, then temporal proximity alone would be enough. But Clover says temporal proximity is not enough. Let me give a different example. I think we'll also clear it up. So here's my concern. If you have a case where everybody gives a diametrically opposed perspective on what was said and what wasn't said, and if everybody on the plaintiff's side says this happened and everybody on the employer's side says this didn't happen, when do you deny summary judgment? Ever? Or do you grant summary judgment for the employer because the employee can never really contradict what was in somebody's mind through direct evidence? I don't believe that the plaintiff can ever prevail in this type of case. So any activity or comment statement from the decision maker after the protected activity but before the subsequent adverse action could be circumstantial evidence that they knew. So there is another case that I think provides a good example of what I mean by that. There's a Third Circuit case, D&D, I believe, Distributions, which was cited actually in an appellant's brief. And the plaintiff had gone and filed a charge of discrimination with, I believe, the state reporting agency and come back to the office, and the decision maker, when she came back to the office, made a comment to her saying, I know where you've been, or something to that effect. That's evident. When the decision maker later denied and said, that's not what I meant by that comment, but I didn't know about your protected activity, the court said, you can't make that assertion. There's sufficient circumstantial evidence to create a genuine issue of material fact that you, in fact, knew because you made this comment suggesting that you knew, not suggesting that you could have known, suggesting that you knew. So that kind of circumstantial evidence is sufficient to create a genuine issue of material fact. Here, all we have is evidence that Ms. Bain met with Mr. Hogan, that she could have told him during that meeting. Both of them testify that she didn't, and Ms. Martin has no evidence that she did. So to quote one of the passages in Clover. Well, she told him that there had been a complaint, right? That much is undisputed. Ms. Bain told Mr. Hogan that Ms. Martin had complained, the language is escaping me, but that she had, it was a complaint about the criticism. She felt that she was being targeted. Right, I'm not suggesting she told him that it was based on discrimination grounds, but she told him that Ms. Martin had lodged a complaint, right? That's correct, Your Honor. That much is undisputed. That's correct, Your Honor. So to quickly move to the FMLA component, the second issue in this case. Ms. Martin's FMLA claim has failed because she cannot show she was entitled to FMLA benefits when she requested time off. This is true for two reasons, either of which is sufficient to defeat her FMLA claims. Reason number one, she cannot show the health care provider ever found that she was unable to perform the functions of her job. That reason goes almost completely unrebutted in appellant's briefing. Within the time limit, there's supposed to be a certain amount of time, right? I'm sorry, Your Honor? There's supposed to be a certain amount of time that she's supposed to bring it to the employer's attention. She saw this other person about it eight months later. There are two subsections of the definition for a serious health condition. One requires that you see the health care provider within seven days of the onset of the period of incapacity. That's the incapacity and treatment prong. The other is the chronic conditions prong, which requires that your condition require periodic visits to a health care provider, I believe is the language. So you have to show that your condition required you to visit a health care provider, which necessitates that you actually have visited a health care provider. 29 U.S.C. 2612 states that an employee is entitled to protected leave for, among other reasons, a serious health condition that makes the employee unable to perform the functions of the position of such employee. The Department of Labor Regulation 29 CFR 2825123 says an employee is unable to perform the functions of the position where the health care provider finds the employee is unable to work at all, is unable to perform the functions, any of the functions, essential functions of the employee's position. Even if we assume Ms. Bruce was a health care provider, which she was not, Ms. Bruce also never found or determined that Ms. Martin was unable to perform the functions of her job and never instructed her not to work. Your Honor, may I have just a couple more seconds to cover another ancillary point? You have 30 seconds, if you'd like. Thank you, Your Honor. In the appellant's reply brief, she argues that Ms. Martin was a health care provider under subsection B-4 of regulation 29 CFR 825125. We'd like to refer the court to an unpublished decision that was submitted as part of the appellee's motion of summary judgment. It's at the docket 622, McIntosh v. Android Industries, LLC. That opinion contains a very well-reasoned and cogent explanation for why Ms. Bruce does not, in fact, meet the definition of that prong. Thank you. All right, thank you very much. I'd like to address three points very quickly, Your Honors. First, as to the issue of temple proximity, that is a very powerful fact for the retaliation claims in this case. Ms. Martin was terminated within two days of making her complaint. The trial court itself said, and I'm quoting what the trial court said, the temporal proximity between plaintiff's alleged complaint and her termination two days would generally be enough to support an inference of causal connection. That was the trial court's very words. And then the trial court went through all of the factors that I described to you. The second thing is I want to tell you the facts in our case are much stronger than the ones that are in Clover. And here are some of the distinguishing facts. First of all, Clover did not involve prior charges of discrimination. Second, in Clover, there was not a handbook that required the notice to be given to the perpetrator as there was in this particular case. Also, in Clover, you didn't have any of the shifting reasons that are in this case. But I think the most important factor of all of this is the Supreme Court's decision in Reeves v. Sanderson Plumbing Products, Inc. In that case, the court revisited the standard for summary judgment in employment cases. And essentially what the court did is it lightened the plaintiff's burden because the court realized that we were getting to a situation where plaintiffs could never meet their burden the way many of the courts were construing the standard. And I suggest to the court, Reeves was decided in 2000, that if Clover were decided under Reeves, it may have very well come to a different conclusion. But the key standard of what happened is that the court must evaluate as a whole, the record as a whole, and that's where the totality of circumstances come in, and find that a reasonable jury could not possibly find in favor of the plaintiff. And what the court also said is, a prima facie case combined with sufficient evidence to find that an employer's asserted justification is false may permit the trier of fact to conclude that the employer unlawfully discriminated. And I think Reeves gives this court guidance as to how to look at all the totality of the circumstances. Thank you. All right. Thank you both very much. Thank you.